UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────────

AMES RAY,

                    Plaintiff,

          -v.-

BALESTRIERE FARIELLO, JOHN G.
BALESTRIERE, and JOHN DOES 1-5,

                    Defendants.

───────────────────────────────────

BALESTRIERE FARIELLO,

              Counterclaim-Plaintiff,

          -v.-

AMES RAY,

              Counterclaim-Defendant.

───────────────────────────────────

18 Civ. 11211 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

        This case is but another chapter in the decades-long litigation saga of

Plaintiff/Counterclaim-Defendant Ames Ray ("Ray") and his former wife,

Christina Ray ("Christina"). After a prior round of hotly-contested motion

practice and protracted discovery, Ray seeks summary judgment as to his

breach of fiduciary duty claim against his former attorneys — John G.

Balestriere ("Balestriere"), the law firm Balestriere Fariello ("BF," and with

Balestriere, the "BF Parties"), and John Does 1-5 (collectively, "Defendants")[1] —

as well as dismissal of BF's counterclaims for breach of contract and account

───────────────────

[1]        John Does 1-5 have neither been identified nor appeared in this action.

stated.  Conversely, Defendant/Counterclaim-Plaintiff BF seeks summary judgment on its account stated counterclaim, and the BF Parties jointly seek dismissal of Ray's claims for breach of fiduciary duty, violations of New York Judiciary Law ("JL") § 487, and conversion.  In brief, Ray alleges that Defendants, who represented him in filing a fraudulent conveyance action against Christina in New York State Supreme Court, (i) failed to advise him of a conflict of interest that arose when it became likely that the state court judge would impose sanctions on both Ray and Defendants, (ii) pursued their own interests at the expense of Ray's, despite purporting to represent him, and (iii) improperly withheld Ray's litigation file following BF's termination as Ray's counsel.  The BF Parties counter that no conflict of interest existed between Ray and BF and, instead, that Ray has improperly refused to pay BF $66,860.61 in accrued legal fees arising from the fraudulent conveyance action.

For the reasons that follow, the Court denies both motions for summary judgment as to Ray's breach of fiduciary duty claim and BF's account stated claim; grants Ray's motion as to BF's breach of contract counterclaim; grants the BF Parties' motion as to Ray's JL § 487 claim; and denies the BF Parties' motion as to Ray's conversion claim.

## BACKGROUND[2]

### A.   Undisputed Factual Background

### 1.   Litigation History and Defendants' Representation of Ray

In 1998, Ray commenced a lawsuit against Christina for alleged breaches of promissory notes and contracts (the "1998 Action").  (BF 56.1 ¶ 1).  Ray was represented by Peter Alkalay ("Alkalay") of McLaughlin & Stern, LLP in the 1998 Action.  (*Id.* at ¶ 2).  The trial court dismissed the 1998 Action, but on appeal the Appellate Division, First Department reversed and reinstated Ray's complaint against Christina.  (BF 56.1 ¶ 6; Pl. Counter 56.1 ¶ 6).

In late September 2010, Ray retained BF to represent him in a lawsuit against Christina in which he alleged that she had made a series of fraudulent

---

[2]    The facts stated herein are drawn from the parties' submissions in connection with their motions for summary judgment.  Ray's Local Rule 56.1 Statement of Facts is referred to as "Pl. 56.1" (Dkt. #96), and the BF Parties' Local Rule 56.1 Statement of Facts is referred to as "BF 56.1" (Dkt. #100).  Ray's Counterstatement to the BF Parties' Rule 56.1 Statement and Additional Statement of Undisputed Facts is referred to as "Pl. Counter 56.1" (Dkt. #110), and the BF Parties' Counterstatement to Ray's Rule 56.1 Statement is referred to as "BF Counter 56.1" (Dkt. #114).  The BF Parties' Response to Ray's Counterstatement is referred to as "BF Reply 56.1" (Dkt. #125).  Plaintiff's amended complaint is referred to as the "Complaint" or "Compl." (Dkt. #24), and BF's counterclaim is referred to as the "Counterclaim" (Dkt. #42).

Citations to the parties' Rule 56.1 Statements incorporate by reference the documents and deposition testimony cited therein.  *See* Local Rule 56.1(d).  Generally speaking, where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Rule 56.1(c), (d); *Biberaj* v. *Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." (internal quotation marks omitted) (quoting *T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009))).

For ease of reference, the Court refers to Ray's memorandum of law in support of his motion for summary judgment as "Pl. Br." (Dkt. #97), and to the exhibits attached thereto as "Pl. Ex. [ ]" (Dkt. #80-95, 104).  The Court refers to the BF Parties' memorandum of law in support of their motion for summary judgment as "BF Br." (Dkt. #99), and to the exhibits attached thereto as "BF Ex. [ ]" (Dkt. #98, 102-103); to Ray's brief in opposition as "Pl. Opp." (Dkt. #109); and to the BF Parties' reply memorandum of law as "BF Reply" (Dkt. #124).

conveyances to her counsel and her business consulting company to avoid paying Ray at least $974,610.70 she owed him (the "First Fraudulent Conveyance Action").  (Pl. 56.1 ¶ 1; BF 56.1 ¶ 3; BF Counter 56.1 ¶ 82).  The First Fraudulent Conveyance Action was captioned *Ray* v. *Ray*, Index No. 652314/2010 (N.Y. Sup. Ct.), and proceeded before Justice Charles E. Ramos.  (Pl. 56.1 ¶ 2).  The retainer agreement between BF and Ray in the First Fraudulent Conveyance Action stated in relevant part: "I [Balestriere] understand that Peter Alkalay, Esq., will continue as your litigation counsel and that I will be consulting with Charles J. Moxley, Jr., Esq. ["Moxley"], behind the scenes on a confidential basis.  Charles Moxley will research the fraudulent conveyance issues and report to me on them."  (BF 56.1 ¶ 5).

During oral argument in the First Fraudulent Conveyance Action on April 28, 2011, Justice Ramos indicated that he intended to dismiss the case (Pl. 56.1 ¶ 3), which he then did on July 14, 2011 (BF 56.1 ¶ 7).  In discussions with Ray regarding Justice Ramos's decision in the First Fraudulent Conveyance Action, Balestriere wrote that "now we have seen that it is not only [a tough claim], but that Justice Ramos doesn't like this case and that he even considers it brought in bad faith."  (Pl. 56.1 ¶ 4).  Accordingly, Balestriere recommended against appealing the decision, going so far as to say that it would be difficult for him to continue representing Ray in the matter if the case were returned to Justice Ramos following a successful appeal.  (BF Counter 56.1 ¶¶ 4-6; *see also* Pl. Counter 56.1 ¶ 68).  Specifically, Balestriere warned Ray: "I cannot put myself and my firm at the reputational risk when I am still

in my 30s of having the judge practically promise that he will sanction me if I proceed." (Pl. 56.1 ¶ 5). Nevertheless, Ray decided to proceed with the appeal of Justice Ramos's decision, and BF continued to represent him. (*Id.* at ¶ 7). The First Department affirmed the dismissal. (*Id.*; BF 56.1 ¶ 7). *See Ray* v. *Ray*, 970 N.Y.S.2d 9 (1st Dep't 2013).

Following the dismissal of the First Fraudulent Conveyance Action, Ray and Defendants discussed the prospect of filing a second fraudulent conveyance lawsuit based on additional information Ray had ostensibly learned about Christina's transfer of funds to her consulting company, Guarnerius Management, LLC ("Guarnerius"). (Pl. 56.1 ¶ 8; BF 56.1 ¶ 8). On July 15, 2013, after evaluating the potential claim, Defendants advised Ray that they believed he had "a meritorious suit." (BF 56.1 ¶ 8). However, Defendants also told Ray that if the case were filed in state court it would likely be assigned to Justice Ramos, who would probably view the matter unfavorably, dismiss the case, and impose sanctions against Ray and Defendants. (*Id.*; *see also* Pl. 56.1 ¶¶ 9, 11; BF Counter 56.1 ¶¶ 9, 11). Ray and Defendants ultimately decided to proceed in state court and filed suit on April 23, 2014 (the "Second Fraudulent Conveyance Action"). (BF Counter 56.1 ¶¶ 10, 13; *see also* BF 56.1 ¶ 11). Ray and BF executed an amended engagement letter on August 27, 2014, concerning BF's representation of Ray in the Second Fraudulent Conveyance Action. (Pl. Counter 56.1 ¶¶ 11-12). Of note, when determining whether and how to proceed with the Second Fraudulent Conveyance Action, Defendants did not indicate to Ray that the risk of Justice Ramos's imposing sanctions

might create a conflict of interest between Ray and Defendants.  (Pl. 56.1 ¶ 12; BF Counter 56.1 ¶ 12).

On August 1, 2014, Christina and Guarnerius filed a motion to dismiss the Second Fraudulent Conveyance Action and for sanctions against Ray and his counsel.  (BF 56.1 ¶ 13).  *See Ray* v. *Ray*, Index No. 153945/2014, 2016 WL 11264785, at *1 (N.Y. Sup. Ct. June 28, 2016) (judgment).  During a hearing on November 12, 2014, Justice Ramos — to whom the case was indeed assigned — told the parties that he intended to dismiss the Second Fraudulent Conveyance Action and would hold a subsequent hearing regarding possible sanctions on Ray and Defendants.  (Pl. 56.1 ¶ 22; BF 56.1 ¶ 14).  Following the November 2, 2014 hearing, Balestriere expressed to Ray his belief that Justice Ramos was wrong to grant the dismissal and sanctions motion and, further, that BF was "prepared to handle whatever we must going forward."  (Pl. 56.1 ¶ 23; BF 56.1 ¶ 15; BF Counter 56.1 ¶ 26).  Balestriere also told Ray that BF would "very likely need to hire an attorney to represent [BF] in any sanctions proceedings or litigation"; that "such counsel would formally represent the firm and make arguments on behalf of the firm while [BF would work] very closely with such lawyer both to fend off any sanctions against [Ray] and to assist the lawyer as he needs"; and that Balestriere believed that "[Ray's] interests and that of the firm are completely aligned" with respect to potential sanctions.  (Pl. 56.1 ¶ 24).  To that end, in late November 2014, BF hired Partha Chattoraj ("Chattoraj") from the firm of Allegaert Berger & Vogel LLP as its counsel for sanctions proceedings.  (*Id.* at ¶ 26; BF Counter 56.1 ¶ 26).  Once again,

however, Defendants did not suggest to Ray at that time that there was a potential for conflict, or that he should consider retaining additional counsel to defend him in any sanctions proceedings.  (Pl. 56.1 ¶¶ 24-25; BF Counter 56.1 ¶¶ 24-25).

On September 15, 2015, Justice Ramos issued an order formally dismissing the Second Fraudulent Conveyance Action and reiterating that he would hold a hearing to determine whether sanctions would be imposed, in what amount, and against whom.  (Pl. 56.1 ¶¶ 27-28).  Around that time, in discussing the upcoming sanctions hearing, Ray wrote to another one of his attorneys — not a member of BF — that a BF attorney had "volunteered to be thrown under the bus" with respect to the decision to file the Second Fraudulent Conveyance Action.  (BF 56.1 ¶ 17; Pl. Counter 56.1 ¶ 17).  And in October 2015, BF sent a letter to Justice Ramos stating that Ray had relied on BF's advice in filing the Second Fraudulent Conveyance Action and requesting that Ray be excused from testifying at the sanctions hearing.  (BF 56.1 ¶ 17; Pl. Counter 56.1 ¶ 17).

In November 2015, at Ray's direction, BF attorneys sent Christina's counsel, Donald Watnick ("Watnick"), a proposal to settle her request for sanctions against Ray and Defendants out of court for $3,000, bonded pending affirmance by the First Department of Justice Ramos's order dismissing the Second Fraudulent Conveyance Action.  (Pl. 56.1 ¶ 29; BF Counter 56.1 ¶¶ 29, 32).  Watnick rejected the offer.  (BF Counter 56.1 ¶ 32).  Negotiations continued through November and December, but were unsuccessful.  (*See* Pl.

Counter 56.1 ¶ 18; BF Counter 56.1 ¶ 32).  On December 7, 2015, Balestriere

advised Ray that he believed it was in Ray's best interest

> to resolve the sanctions issue through settlement [because] … the risk of proceeding with the hearing is simply too high.  Particularly given that part of your defense is that you relied on the advice of counsel, there is a significant risk that Justice Ramos could declare attorney-client privilege waived and order us [to] turn over all communications between us.  Turning over these emails would be harmful both at the hearing and in the [1998 Action].
>
> In addition to eliminating the risk of being forced to turn over emails that would have a highly negative impact on both the hearing and the [1998 Action], resolving the sanctions through settlement would allow us to focus on the fraudulent conveyance case and notice an appeal to move forward with appealing the motion to dismiss decision.

(BF Counter 56.1 ¶ 32).

Concurrently with the Second Fraudulent Conveyance Action, beginning

in May 2014, Ray raised with Defendants the possibility of bringing a JL § 487

lawsuit against Christina's counsel — Watnick and Julie Stark — for allegedly

defamatory comments they had made about Ray in the 1998 Action.  (Pl. 56.1

¶ 14; BF 56.1 ¶ 9; Pl. Counter 56.1 ¶ 9).  Defendants informed Plaintiff that he

likely did not have a viable cause of action against Christina's attorneys under

JL § 487 and that Defendants would not represent Plaintiff in bringing such a

claim.  (Pl. 56.1 ¶ 15; *see also* Pl. Counter 56.1 ¶ 9).  Defendants continued to

advise Ray in subsequent months against bringing a JL § 487 claim, but Ray's

desire to file suit against Christina's attorneys persisted, and in June 2015 he

hired attorney Frank Raimond ("Raimond") to represent him for that purpose. (Pl. Counter 56.1 ¶¶ 19, 21; BF Counter 56.1 ¶¶ 16-19).

On December 2, 2015, Raimond wrote to Ray and Defendants that he "suspect[ed] that when the JL 487 claim is filed [] any opportunity to settle about the fees [would] be gone." (Pl. 56.1 ¶ 33).  In response to Raimond's email, Balestriere wrote that "[w]hile the choice as to whether to initiate the JL 487 lawsuit and, if you do, when you initiate such suit is yours and [Ray's], it is my strong view that if you do initiate such action, it is in [Ray's] best interests to file after resolution of the hearing on sanctions and after resolution of the trial on the [1998 Action]." (*Id.* at ¶ 34).  On or around December 4, 2015, Justice Ramos adjourned the sanctions hearing from December 8-9, 2015, to January 11-12, 2016.  (*Id.* at ¶ 35).  On several occasions thereafter, Balestriere reiterated his view that Ray should not file the JL § 487 claim, or at least should wait until after the sanctions hearing in the Second Fraudulent Conveyance Action, because the JL § 487 lawsuit would likely harm both settlement discussions with Christina's counsel and Ray's position in the sanctions hearing.  (*Id.* at ¶ 41; BF 56.1 ¶ 19; BF Counter 56.1 ¶¶ 38, 41).  In Balestriere's view, "[f]iling [the JL § 487] claim before the sanctions hearing would be especially harmful" because it would "color [Ray's] testimony and good faith defense, impacting [Ray's] chance of receiving a favorable judgment" from Justice Ramos.  (BF Counter 56.1 ¶ 38).

Additionally, on December 8, 2015, Balestriere told Raimond:

> [W]e unfortunately believe that we will have to move to withdraw [from representing Ray in the Second

> Fraudulent Conveyance Action] if the JL 487 claim is
> filed prior to the resolution of the sanctions issue.  This
> is because of the potential irreconcilable conflict raised
> and the possibility that the sanctions hearing will result
> in our firm being forced to turn over reams of attorney-
> client privileged communications.  It will be devastating
> for Ames, as I told him and wrote him yesterday.

(BF Counter 56.1 ¶ 38).  Chattoraj, BF's outside counsel on the sanctions

issue, agreed with BF's views, advising BF that the best way to protect BF

would be to "[i] settle; [ii] do what we need to [do] so that Ray's rights to appeal

are not waived (file notice of appeal); and [iii] withdraw."  (Pl. 56.1 ¶ 48).

BF's urging notwithstanding, on December 18, 2015, Raimond notified

Balestriere that Ray had instructed him to file the JL § 487 complaint before

the sanctions hearing.  (Pl. 56.1 ¶ 53; BF Counter 56.1 ¶ 38).  Balestriere

responded:

> [I]f you file now while we are negotiating the sanctions
> settlement I have every confidence that Watnick will
> newly seek sanctions against Ames and us for bad faith
> negotiations.  We will then be forced to withdraw and
> disclose that you ignored my advice and acted against
> Ames's and our firm's interests.  If you file the complaint
> I reserve all rights for you to be liable for any costs,
> including but not limited to, legal fees which our firm
> shall incur in defending ourselves from a sanctions
> motion brought upon by your acting against Ames's
> interests.  Moreover, I expect our exchanges on this
> settlement and our emails to you will be discoverable.
>
> You are not acting in Ames's interests here.  You will
> hurt him tremendously if you file this complaint now.

(BF Counter 56.1 ¶ 38; *see also* Pl. 56.1 ¶ 53).  Also on December 18, 2015, BF

sent to both Ray and Watnick a draft settlement agreement that offered to

resolve the sanctions in the Second Fraudulent Conveyance Action for a flat

sum of $16,000.  (Pl. 56.1 ¶ 52; BF Counter 56.1 ¶ 52).  Ray ultimately decided against settling because the proposed agreement did not require that the payment be bonded pending appeal.  (Pl. 56.1 ¶ 54; BF Counter 56.1 ¶ 54; *see also* Pl. Ex. 59, BF-0042628).

On December 28, 2015, Ray told Balestriere that the JL § 487 lawsuit would be imminently filed, and that if BF needed to withdraw as a result, BF should send Ray its final bill.  (Pl. 56.1 ¶ 55).  Somewhat curiously, Balestriere responded by saying that despite the concerns previously expressed, BF still intended to represent Ray at the sanctions hearing scheduled for January 11-12, 2016.  (*Id.* at ¶¶ 56-57; BF Counter 56.1 ¶¶ 56-57; *see also* Pl. Ex. 60, BF-0008227).

On December 31, 2015, Ray filed the JL § 487 action in this District.  (Pl. 56.1 ¶ 43 n.3; *see also* Pl. Ex. 30).  *See Ray* v. *Watnick*, No. 15 Civ. 10176 (JSR), Dkt. #1 (S.D.N.Y. Dec. 31, 2015).  The same day, Ray asked Raimond for a recommendation of an attorney who could represent him in the Second Fraudulent Conveyance Action in place of BF, and tasked Raimond with researching the potential consequences of BF withdrawing from its representation of Ray.  (Pl 56.1 ¶ 57).  Ray also shared with Raimond and Alkalay a draft email to Balestriere in which he expressed concerns about BF's continued representation of him in light of the risk of sanctions and Justice Ramos's ordering disclosure of attorney-client communications, as well as the remaining possibility that BF would decide to withdraw at some point.  (*Id.* at

11

¶¶ 58-59).  Alkalay advised Ray not to send the email to Balestriere.  (*Id.* at

¶ 59; BF Counter 56.1 ¶ 59).

On January 4, 2016, Balestriere wrote to Ray and Raimond:

> [T]here's been a misunderstanding.  We are fine for the hearing.  I had suggested to Ames that if we had to move to withdraw that he should consider other current counsel like Frank or Peter.   Since we are not withdrawing and shall represent Ames at the hearing next week, we do not need to worry about bringing in Frank or Peter for such hearing.

(Pl. 56.1 ¶ 63).  On January 6, 2016, Ray responded:

> You last month have told me that I need an attorney to represent me on my fraudulent conveyance lawsuit, that your legal interests are antagonistic to mine, that your emails may go to defendant, and that you will quit me under the circumstances.  As you know, I have spent weeks scrambling to get an attorney to represent me on my fraudulent conveyance lawsuit.  I have understood that you have relieved yourself as my counsel.

(*Id.* at ¶ 64).

Ray subsequently informed Balestriere that Raimond would be appearing

on his behalf at the sanctions hearing, which notice Balestriere interpreted as

Ray's termination of BF as his counsel in the Second Fraudulent Conveyance

Action.  (Pl. 56.1 ¶ 66; BF 56.1 ¶ 22).  On January 8, 2016, Raimond filed a

Consent to Change Counsel.  (BF 56.1 ¶ 25).  Raimond represented Ray at the

sanctions hearing on January 11-12, 2016 (Pl. 56.1 ¶ 67), and later testified

that he was prepared and able to competently represent Ray at the hearing (BF

56.1 ¶ 28).  Justice Ramos did not require Defendants to turn over their

communications with Ray, nor did Ray's filing of the JL § 487 action prompt

Watnick to seek additional sanctions against BF for negotiating a settlement in

bad faith, as Balestriere had predicted.  (Pl. 56.1 ¶ 67).  Following the hearing, Balestriere and Raimond viewed BF's and Ray's interests with respect to sanctions as aligned and worked together on proposed findings of fact and conclusions of law.  (*Id.* at ¶ 69; BF 56.1 ¶¶ 32-33; Pl. Counter 56.1 ¶¶ 32-33).

On March 7, 2016, Justice Ramos issued an order finding that the Second Fraudulent Conveyance Action was frivolous and sanctioning Ray and BF jointly and severally for Christina's attorneys' fees, in the amount of $33,900.53.  (Pl. 56.1 ¶ 68; BF 56.1 ¶ 31; Pl. Ex. 69).  In June 2016, BF entered into a settlement agreement with Christina regarding her attorneys' fees, pursuant to which agreement BF paid $20,000 to resolve only their potential sanctions liability.  (Pl. 56.1 ¶ 78; BF Counter 56.1 ¶ 78; *see also* Pl. Ex. 78).  Ray appealed Justice Ramos's orders dismissing the Second Fraudulent Conveyance Action and imposing sanctions (BF 56.1 ¶ 35), and in that effort received legal counsel from Raimond, Alkalay, and Moxley (Pl. Counter 56.1 ¶ 144; *see also* Pl. Ex. 2, Response No. 3).  On February 18, 2018, the First Department affirmed the dismissal but reversed the sanctions award.  (Pl. 56.1 ¶ 80).  *See Ray* v. *Ray*, 68 N.Y.S.3d 724 (1st Dep't 2018).

Ray's JL § 487 action in this District was dismissed on April 26, 2016, *see Ray* v. *Watnick*, 182 F. Supp. 3d 23 (S.D.N.Y. 2016), and the dismissal was affirmed by the Second Circuit, *see* 688 F. App'x 41 (2d Cir. 2017) (summary order).  (BF 56.1 ¶ 36).

On September 18, 2016, Ray emailed Balestriere, two other BF attorneys, and Chattoraj to request production of litigation files for the actions in which

BF represented Ray.  (Pl. 56.1 ¶ 79; Pl. Ex. 80).  BF did not produce Ray's litigation file prior to Ray commencing the instant action.  (*See* Pl. 56.1 ¶ 79; BF Counter 56.1 ¶ 79).

### 2.    BF's Attempts to Receive Payment

On January 5, 2016, BF sent Ray an invoice for $28,245.99, for work performed by BF and Chattoraj in the Second Fraudulent Conveyance Action up through the end of December 2015.  (BF 56.1 ¶ 34; BF Ex. 26).  On January 21, 2016, Marc Natale, BF's Chief of Staff, called Ray to discuss the status of the January 5 invoice.  (Pl. 56.1 ¶ 71; Pl. Ex. 71, BF-0012658).  Ray did not answer Natale's questions about when the invoice would be paid.  (Pl. Ex. 71, BF-0012658).  The next day, January 22, 2016, Balestriere and Ray had a telephone call in which Balestriere also tried to raise the issue of the outstanding invoice.  (Pl. 56.1 ¶ 71).  Ray refused to discuss the invoice and hung up on Balestriere.  (*Id.*; Pl. Counter 56.1 ¶ 48; BF Counter 56.1 ¶ 71; *see also* Pl. Ex. 71, BF-0012658).

On February 4, 2016, March 1, 2016, and April 6, 2016, BF sent Ray invoices for legal fees accrued from January through March 2016.  (BF 56.1 ¶ 34; *see also* BF Ex. 27-29).  BF's invoices reflected an outstanding balance of $56,373.80 at the end of January 2016 (Pl. 56.1 ¶ 72; BF Ex. 27); $63,507.80 at the end of February 2016 (Pl. 56.1 ¶ 73; BF Ex. 28); and $66,860.61 at the end of March 2016 (Pl. 56.1 ¶ 75; BF Ex. 29).  Ray did not pay these invoices and repeatedly declined to tell BF if he would.  (Pl. 56.1 ¶ 74; BF 56.1 ¶ 34; Pl.

Counter 56.1 ¶ 34; BF Counter 56.1 ¶ 71; Pl. Ex. 75, GW-2451; Pl. Ex. 77, GW-3054).

## B.    Procedural Background

Ray filed his initial complaint in this action on December 3, 2018.  (Dkt. #1; *see also* Dkt. #4).  On April 1, 2019, Ray filed an amended complaint (the "Complaint"), which is the operative pleading in this matter, alleging claims for breach of fiduciary duty, violations of JL § 487, and conversion.  (Dkt. #24). The BF Parties subsequently filed a motion to dismiss the Complaint (Dkt. #29), which motion the Court denied on October 16, 2019 (Dkt. #37).  *See Ray* v. *Balestriere Fariello LLP*, No. 18 Civ. 11211 (KPF), 2019 WL 5212359, at *1 (S.D.N.Y. Oct. 16, 2019) ("*Ray BF I*").

On December 5, 2019, the BF Parties filed their Answer to the Complaint (Dkt. #41), and BF filed a Counterclaim alleging breach of contract and account stated (Dkt. #42).  The Court entered a Civil Case Management Plan and Scheduling Order on December 19, 2019 (Dkt. #46), and Ray answered BF's Counterclaim on January 13, 2020 (Dkt. #49).  Following several extensions of the discovery schedule (Dkt. #52, 64, 68), on August 20, 2020, the parties notified the Court that discovery was complete (Dkt. #70).  On August 27, 2020, the Court referred the case to Magistrate Judge Katharine H. Parker for a settlement conference (Dkt. #71); the conference was held on October 22, 2020 (*see* Minute Entry for October 22, 2020), but did not result in a settlement.

On October 27, 2020, the Court approved the parties' proposed schedule for summary judgment briefing.  (Dkt. #76).  Pursuant to that schedule, the

parties filed their respective motions for summary judgment on December 22, 2020 (Dkt. #79-97, 104 (Ray); Dkt. #98-103 (the BF Parties)).[3]  The parties filed their respective opposition papers on January 21, 2021 (Dkt. #109-112 (Ray); Dkt. #113-116 (the BF Parties)), and their reply papers on February 11, 2021 (Dkt. #121-122 (Ray); Dkt. #124-126 (the BF Parties)).  The motions are thus fully briefed and ripe for resolution.

## DISCUSSION

In his motion, Ray seeks (i) summary judgment in his favor as to his breach of fiduciary duty claim against Defendants, and (ii) dismissal of BF's counterclaims for breach of contract and account stated.  In their joint motion, the BF Parties seek dismissal of Plaintiff's claims for breach of fiduciary duty, violations of JL § 487, and conversion, while BF seeks summary judgment in its favor as to its account stated counterclaim.  The Court grants Ray's motion in part and denies it in part; grants the BF Parties' motion in part and denies it in part; and denies BF's motion.

### A.    Summary Judgment Under Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322

---

[3]    Both parties filed supporting materials on December 23, 2020, past the deadline of December 22, 2020.  (*See* Dkt. #99-104).  Despite the tardiness, the Court accepts and considers these materials in its analysis of the parties' motions.

(1986).[4]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor."  *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a *genuine issue for trial.*"  *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations and quotation marks omitted).  The nonmoving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

---

[4]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

**B.      The Court Denies Summary Judgment as to Ray's Breach of Fiduciary Duty Claim**

In his Complaint, Ray first alleges that Defendants breached their fiduciary duty to him as his counsel "by placing their pecuniary and reputational interests above that of Plaintiff's." (Compl. ¶ 48). Specifically, he says, Defendants "fail[ed] to apprise Plaintiff of the conflict of interest that would exist and, in fact, did exist when Justice Charles E. Ramos imposed sanctions against Plaintiff and Defendants" in the Second Fraudulent Conveyance Action (*id.*); "abandon[ed] Plaintiff on the eve of a sanctions hearing" (*id.*); "threatened to disclose confidential and privileged communications between Plaintiff and Defendants to Ms. Ray and her counsel[;] and threatened to sue Frank Raimond, Plaintiff's counsel on a contemplated JL § 487 lawsuit against Ms. Ray's counsel" (*id.*). Both parties seek summary judgment as to this claim: Ray seeks a determination that Defendants breached their fiduciary duties to him and caused him financial harm, and the BF Parties seek dismissal of the claim on the basis that Ray has not presented evidence showing either a conflict of interest or damages.

**1.      Applicable Law**

To state a claim for breach of fiduciary duty under New York law in the attorney-client context, a former client must plead that: (i) a fiduciary duty existed between plaintiff and defendant; (ii) defendant knowingly breached that duty; and (iii) damages resulted from the breach. *See Whitney* v. *Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986); *Gottsch* v. *Eaton & Van Winkle LLP*, 343 F. Supp. 3d 372, 376 (S.D.N.Y. 2018).

18

2.    **Analysis**

As this Court explained in its Opinion and Order on the BF Parties'

motion to dismiss:

> Rule 1.7 of the New York Rules of Professional Conduct
> provides that a lawyer shall not represent a client if a
> reasonable lawyer would conclude that "there is a
> significant risk that the lawyer's professional judgment
> on behalf of a client will be adversely affected by the
> lawyer's own financial, business, property or other
> personal interests."   Rule 1.7(a)(2).   "A lawyer who
> possesses a financial interest in a lawsuit akin to that
> of a defendant may not, as a general rule, represent the
> plaintiff in the same action."   *Greene* v. *Greene*, 47
> N.Y.2d 447, 452 (1979) (disqualifying law firm that had
> a "direct and substantial stake in the outcome of the
> litigation").   That is because the professional judgment
> of a lawyer should be exercised solely for the benefit of
> the client and free of compromising influences and
> loyalties. *See* Rule 1.7, comment 1.  Such a conflict may
> be waived, but only upon informed consent of the client.
> *See* Rule 1.7(b).

*Ray BF I*, 2019 WL 5212359, at *6.  Furthermore, "[a] sanctions motion

attacking the factual basis for the suit will almost inevitably put [the client and

lawyer] in conflict," given the incentives for both sides to disclaim

responsibility.  *Healey* v. *Chelsea Res., Ltd.*, 947 F.2d 611, 623 (2d Cir. 1991);

*see also Eastway Constr. Corp.* v. *City of New York*, 637 F. Supp. 558, 570

(E.D.N.Y. 1986) ("If attorney and client disagree about who is at fault and point

their fingers at each other, the interests of the two are now clearly adverse.").

However, where an "attorney and client not only do not contest relative fault

before the court, but have agreed between themselves to privately reallocate

any sanction imposed against them," and it is the attorney who will bear

responsibility for payment, such a situation is generally less problematic and

19

"therefore need not under usual circumstances be interfered with." *Eastway Constr.*, 637 F. Supp. at 570.

While Defendants' conduct in the Second Fraudulent Conveyance Action is not free from reproach, the Court concludes that there are material disputes of fact that preclude summary judgment for either party. Specifically, the Court finds disputed factual questions regarding: (i) whether Ray fully appreciated the nature of the potential conflict posed by Balestriere's interest in protecting his and his firm's reputation, and chose to proceed with BF as his counsel nonetheless (*compare* Pl. 56.1 ¶¶ 5-6, 11, *with* BF Counter 56.1 ¶¶ 5-6, 11); (ii) the extent to which BF accepted responsibility for the filing of the Second Fraudulent Conveyance Action, communicated such acceptance to Justice Ramos, and attempted to exculpate Ray, such that there was no possibility of finger-pointing between BF and Ray in the sanctions proceedings (*compare* BF 56.1 ¶ 17, *with* Pl. Counter 56.1 ¶ 17); (iii) the role of Ray's other attorneys, including Alkalay and Moxley, in providing advice to Ray regarding the Second Fraudulent Conveyance Action and BF's continued role as counsel (*compare* BF 56.1 ¶ 4, 11, *with* Pl. Counter 56.1 ¶¶ 4, 11); and (iv) whether Ray suffered any cognizable damages as a result of Defendants' alleged breach (*compare* BF 56.1 ¶¶ 27-30, 37-42, 44-46, 53-54, *with* Pl. Counter 56.1 ¶¶ 27, 29-30, 37-42, 44-46, 53-54; *compare* Pl. Counter 56.1 ¶ 144, *with* BF Reply 56.1 ¶¶ 144). Reconciliation of these disputed facts is a task properly left for a jury. As such, the Court denies both parties' motions for summary judgment on Ray's breach of fiduciary duty claim.

C.      **The Court Grants Summary Judgment to the BF Parties as to Ray's Judiciary Law § 487 Claim**

Separately, Ray pleads a claim for violations of JL § 487, alleging that Defendants deceived him into believing they were representing his best interests in the Second Fraudulent Conveyance Action, when instead they were pursuing their own self-interest to his detriment.  (Compl. ¶¶ 51-55).  The BF Parties seek summary judgment dismissing this claim on the grounds that Ray cannot show evidence supporting his allegations of an undisclosed conflict of interest or other misconduct, or damages resulting therefrom.  Ray does not seek summary judgment in his favor on the JL § 487 claim but opposes the BF Parties' motion.

1.      **Applicable Law**

Under JL § 487, "[a]n attorney or counselor who … [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party … [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."  JL § 487.  To establish a claim under the statute, "a plaintiff must show, at a bare minimum, 'that defendants: [i] are guilty of deceit or collusion, or consent to any deceit or collusion; and [ii] had an intent to deceive the court or any party.'"  *Ray* v. *Watnick*, 182 F. Supp. 3d 23, 28 (S.D.N.Y. 2016) (quoting *Iannazzo* v. *Day Pitney LLP*, No. 04 Civ. 7413 (DC), 2007 WL 2020052, at *11 (S.D.N.Y. July 10, 2007)); *cf. Aristakesian* v. *Ballon Stoll Bader & Nadler, P.C.*, 85 N.Y.S.3d 548, 550 (2d Dep't 2018) ("[V]iolation of Judiciary Law § 487 requires an intent to

21

deceive, whereas a legal malpractice claim is based on negligent conduct."). A civil action is warranted only where the attorney engaged in a chronic, extreme pattern of delinquency. *See Kuruwa* v. *Meyers*, 823 F. Supp. 2d 253, 259-60 (S.D.N.Y. 2011) (citing *Kaminsky* v. *Herrick, Feinstein LLP*, 870 N.Y.S.2d 1, 8 (1st Dep't 2008)), *aff'd*, 512 F. App'x 45 (2d Cir. 2013) (summary order); *Savitt* v. *Greenberg Traurig, LLP*, 5 N.Y.S.3d 415, 416 (1st Dep't 2015) (dismissing claim since "the complaint fails to show either a deceit that reaches the level of egregious conduct or a chronic and extreme pattern of behavior on the part of the defendant attorneys" (internal quotation marks omitted)).

### 2.    Analysis

Because the BF Parties move for summary judgment, the Court "must resolve all ambiguities and draw all reasonable inferences" in Ray's favor. *Vt. Teddy Bear*, 373 F.3d at 244. Even so, the Court finds no evidence of an "expansive scheme to deceive" Ray (Pl. Opp. 28), or that the BF parties sought to "bully Plaintiff into settling the sanctions issue against his will" (*id.* at 4), as Ray argues. Thus, there is no triable dispute of material fact as to Ray's JL § 487 claim.

Even assuming *arguendo* that the risk of Justice Ramos's imposing sanctions on Ray and Defendants did create a conflict of interest between them, the record does not reflect that Defendants recognized this conflict and chose to hide it from Ray in order to pursue their own interests at his expense, or that Defendants otherwise knowingly acted contrary to Ray's interests. Rather, the evidence presented indicates that Defendants were consistently

candid with Ray about the risk of sanctions and resultant reputational harms (Pl. 56.1 ¶¶ 5-6, 11); took responsibility for their role in the filing of the Second Fraudulent Conveyance Action (Pl. Counter 56.1 ¶ 17); and viewed their interests as aligned with Ray's regarding sanctions (Pl. 56.1 ¶¶ 24, 69). Furthermore, when Defendants recognized a potential conflict between Ray and BF arising out of Ray's intention to file his JL § 487 claim against Christina's lawyers while BF was attempting to settle their joint liability for sanctions in the Second Fraudulent Conveyance Action, Balestriere promptly notified Raimond, who was advising Ray on the JL § 487 matter, that the conflict might force BF to withdraw as Ray's counsel in the Second Fraudulent Conveyance Action.  (*See* Pl. 56.1 ¶ 53; BF Counter 56.1 ¶ 38).  Finally, Ray presents no evidence supporting his allegations that Balestriere conveyed his concern about potentially having to turn over attorney-client communications to Justice Ramos in the sanctions proceedings as a "threat," or that his expression of such concern was a "pretextual justification for [BF's] ham-fisted insistence that Plaintiff settle against his better judgment."  (Pl. Opp. 34).  The record shows that Balestriere raised this possibility not in response to Ray's feedback about settlement proposals, but rather in response to Ray's directive to Raimond to move forward with filing the JL § 487 claim against Christina's counsel while BF was still attempting to negotiate a sanctions settlement.  (*See* Pl. 56.1 ¶ 46; BF Counter 56.1 ¶¶ 25, 38, 40).

　　In short, however ill-considered Defendants' actions may have been in continuing to represent Ray in the Second Fraudulent Conveyance Action, Ray

has not come forward with specific facts that could lead a jury to reasonably
conclude that Defendants committed "a deceit that reaches the level of
egregious conduct or a chronic and extreme pattern of behavior." *Savitt*, 5
N.Y.S.3d at 416.  Accordingly, the Court grants the BF Parties' motion for
summary judgment on Ray's JL § 487 claim.

### D.     The Court Denies Summary Judgment as to Ray's Conversion Claim

Ray also brings a cause of action for conversion, alleging that Defendants
"impermissibly retained possession of Plaintiff's litigation file … despite
repeated requests by Plaintiff for Defendants to return the entire file" (Compl.
¶ 57), and "engaged in systematic overbilling following the cessation of their
representation of Plaintiff in early December 2015 for work purportedly done on
Plaintiff's behalf" (*id.* at ¶ 58).  The BF Parties seek dismissal of this claim on
the grounds that BF has a superior right of possession in the litigation file and,
in any event, Ray now possesses all relevant documents as a result of discovery
in this matter.  Ray "concurs with Defendants that his conversion claim has
been largely rendered moot by Defendants' discovery production of his files
from both fraudulent conveyance lawsuits," but nonetheless "reserve[s] the
right to further pursue his conversion claim to the extent that Defendants have
failed to produce his entire case files."  (Pl. Opp. 6 n.1).

### 1.     Applicable Law

"Under New York law, 'conversion takes place when someone,
intentionally and without authority, assumes or exercises control over personal
property belonging to someone else, interfering with that person's right of

possession.'" *Arcadia Biosciences, Inc.* v. *Vilmorin & Cie*, 356 F. Supp. 3d 379, 403 (S.D.N.Y. 2019) (quoting *Colavito* v. *N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006)).  "In order to succeed on a cause of action to recover damages for conversion, a plaintiff must show [i] legal ownership or an immediate right of possession to a specific identifiable thing and [ii] that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's right." *Giardini* v. *Settanni*, 70 N.Y.S.3d 57, 58 (2d Dep't 2018).

### 2.    Analysis

As above, on the BF Parties' motion for summary judgment, the Court "must resolve all ambiguities and draw all reasonable inferences" in Ray's favor.  *Vt. Teddy Bear*, 373 F.3d at 244.  In doing so, the Court concludes that there are disputes of fact as to who possessed the superior right of possession over Ray's litigation file and, if Ray possessed the superior right, whether Defendants improperly denied Ray access to the file despite Ray's demands for it.

As an initial matter, the BF Parties do not dispute that for some time they refused Ray's requests to turn over his litigation file, though they eventually turned over relevant documents in discovery.  (*See* Pl. 56.1 ¶ 79; BF Counter 56.1 ¶ 79).  But even if Ray now possesses all of the records he sought from Defendants — a possibility he raises in his brief in opposition (*see* Pl. Opp. 6 n.1) — the BF Parties do not point to any case law suggesting that eventual relinquishment of unauthorized exclusive control over someone else's

property forecloses a claim for conversion relating to the time during which improper dominion was exerted. In the cases the BF Parties cite in support of summary judgment (*see* BF Br. 20; *see also* BF Reply 13), courts dismissed the plaintiffs' conversion claims not because the claims had become moot, but rather because, among other reasons, the plaintiffs could not show that the defendants had ever deprived the plaintiffs of the use of the property in question. *See Pure Power Boot Camp, Inc.* v. *Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 536 (S.D.N.Y. 2011) (finding that the defendant "possessed only a copy of the [documents in question] and did not, in any way, limit or otherwise deprive Pure Power of possession or use of" the documents); *SBIW, Inc.* v. *Gen. Elec. Co.*, No. 10 Civ. 7812 (PGG), 2013 WL 5338525, at *13 (S.D.N.Y Sept. 24, 2013) ("SBIW has not demonstrated that GE deprived it of the use of its property — an essential element of a claim for conversion."). Thus, these cases do not support the BF Parties' argument that their production of documents during discovery rendered Ray's conversion claim moot.

To the extent the BF Parties mean to suggest instead that they are entitled to summary judgment on Ray's conversion claim because he cannot show actual damages from the alleged conversion of his litigation file (*see* BF 56.1 ¶ 43), this argument fails for two reasons. *First*, Ray asserts that he did sustain damages, even if he cannot precisely quantify them. (Pl. Counter 56.1 ¶ 43 (stating that he paid Moxley to perform legal research on issues already analyzed by Defendants); BF Ex. 32, Response No. 5). *Second*, Ray is not

required at this stage to demonstrate the damages he sustained because of Defendants' alleged conversion.  *See MacGuire* v. *Elometa Corp.*, 592 N.Y.S.2d 730, 730-31 (1st Dep't 1993) ("While defendants urge that there are no damages since they ultimately satisfied all payment obligations …, nominal damages may be awarded as a result of the conversion and plaintiffs should be given an opportunity to prove at trial any other damages they sustained as a result of the conversion." (citing *Silverstein* v. *Marine Midland Tr. Co.*, 152 N.Y.S.2d 30, 31-32 (2d Dep't 1956))).

The BF Parties are likewise not entitled to summary judgment based on their asserted retaining lien over Ray's file.  Under New York law, generally "[w]here a client requests that papers in the possession of his former attorney be returned to him, and the attorney asserts a claim for compensation for services rendered, the attorney is entitled to a determination fixing the value of his services, and the amount so fixed must be paid or otherwise secured to the attorney before any such turnover may be enforced."  *Prout* v. *Vladeck*, 316 F. Supp. 3d 784, 808 (S.D.N.Y. 2018) (quoting *Rosen* v. *Rosen*, 468 N.Y.S.2d 723, 724 (2d Dep't 1983)).  The BF Parties' briefing on this point assumes the validity of their account stated claim.  (*See* BF Br. 20).  However, as will be discussed below, the Court concludes that factual disputes preclude summary judgment on that claim.  (*See infra* Section E).  Additionally, a retaining lien "is available only 'where an attorney's representation terminates and there has been no misconduct, no discharge for just cause and no unjustified abandonment by the attorney.'"  *Prout*, 316 F. Supp. 3d at 808 (quoting *Klein* v.

*Eubank*, 87 N.Y.2d 459, 464 (1996)).  Given that, as discussed above, Ray has

a triable claim that Defendants breached their fiduciary duties to him, the

Court cannot conclude at this stage that Defendants are entitled to a common

law lien.

Accordingly, there remains a material dispute of fact as to which party

possessed a superior right of possession in Ray's litigation file during the

period in question.  The Court therefore denies the BF Parties' motion for

summary judgment on Ray's conversion claim.[5]

## E. The Court Denies Summary Judgment as to Balestriere Fariello's Account Stated Counterclaim

In its Counterclaim, BF asserts a claim for account stated, alleging that

(i) BF sent its last invoice to Ray on April 6, 2016, in the amount of

$66,860.81; (ii) Ray never disputed the invoice before filing this action on

December 3, 2018; and (iii) as there is no allegation or evidence of fraud or

mistake, Ray's failure to dispute the invoice means that it is properly due in

full plus interest.  (Counterclaim ¶¶ 149-155).  Both sides seek summary

judgment as to this claim.

---

[5]     Ray also pleads that Defendants "engaged in systematic overbilling following the cessation of their representation of Plaintiff in early December 2015 for work purportedly done on Plaintiff's behalf." (Compl. ¶ 58).  It is not clear whether Ray included this allegation to support the primary conversion claim relating to BF's retention of Ray's case file, or instead intended to raise a distinct conversion claim.  Neither side addresses this aspect of the conversion claim in their summary judgment briefing.  The Court need not dwell on this issue, but will merely note that there is no indication in the record that BF "assume[d] or exercise[d] control" over funds that rightfully belonged to Ray, given that Ray did not pay BF's invoices for the work in dispute.  Thus, the overbilling allegation alone does not satisfy the elements of a conversion claim.  *See Arcadia Biosciences, Inc.* v. *Vilmorin & Cie*, 356 F. Supp. 3d 379, 403 (S.D.N.Y. 2019).

### 1.    Applicable Law

"An account stated is an agreement between parties to an account based on prior transactions between them with respect to the correctness of the account items and balance due." *Yiwu Lizhisha Accessories Co., Ltd.* v. *Jjamz, Inc.*, 336 F. Supp. 3d 179, 183 (S.D.N.Y. 2018) (quoting *Manhattan Motorcars, Inc.* v. *Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 216 (S.D.N.Y. 2007)). The agreement may be either express or implied. *Id.* (citing *Manhattan Motorcars*, 244 F.R.D. at 216; *IMG Fragrance Brands, LLC* v. *Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009)). "Whether an account stated arises by implication will 'vary with circumstances that surround the submission of the statements and those circumstances include, of course, the relation between the parties.'" *Id.* (quoting *Manhattan Motorcars*, 244 F.R.D. at 216).

To prevail on a claim for account stated, a plaintiff must establish that: (i) an account was presented; (ii) the account was accepted as correct; and (iii) the debtor promised to pay the amount stated. *Yiwu Lizhisha Accessories*, 336 F. Supp. 3d at 183 (quoting *Camacho Mauro Mulholland LLP* v. *Ocean Risk Retention Grp., Inc.*, No. 09 Civ. 9114 (SAS), 2010 WL 2159200, at *2 (S.D.N.Y. May 26, 2010)). Acceptance of the account and a promise to pay "may be implied if 'a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment.'" *Id.* (quoting *IMG Fragrance Brands*, 679 F. Supp. 2d at 411); *see also PMJ Cap. Corp.* v. *Bauco*, No. 16 Civ. 6242 (AJN), 2018 WL 4759741, at *3 (S.D.N.Y. Sept. 29, 2018); *Givens* v. *De Moya*, 146 N.Y.S.3d 291, 294 (2021). In general,

when a client has received an invoice, "the client's act of holding the statement without objection will be construed as acquiescence as to its correctness." *Lapidus & Assocs., LLP* v. *Elizabeth St., Inc.*, 937 N.Y.S.2d 227, 227 (1st Dep't 2012) (quoting *Cohen Tauber Spievak & Wagner, LLP* v. *Alnwick*, 825 N.Y.S.2d 439, 439-40 (1st Dep't 2006)).

### 2.  Analysis

There is no dispute as to the first element, *i.e.*, that BF presented and Ray received the invoices for work performed from December 2015 through March 2016.  (*See* BF 56.1 ¶ 34; Pl. Counter 56.1 ¶ 34).  As for the third element, the record before the Court reflects that Ray never expressly promised to pay the invoices (*see* Pl. 56.1 ¶¶ 71, 74; BF Counter 56.1 ¶ 71; Pl. Counter 56.1 ¶ 48; Pl. Ex. 71, BF-0012658; Pl. Ex. 75, GW-2451; Pl. Ex. 77, GW-3054), and BF does not allege otherwise.  Therefore, the question before the Court at this stage is whether it is: (i) evident beyond reasonable dispute that Ray *did* object to the invoices, such that he should receive summary judgment in his favor; (ii) evident beyond reasonable dispute that Ray *did not* object to the invoices, such that BF should receive summary judgment in its favor; or (iii) subject to reasonable dispute whether Ray sufficiently objected and thus the claim is properly submitted to a jury.

The Court concludes that there is a triable question of fact as to whether Ray adequately conveyed his objections to BF's invoices.  Ray did not acknowledge the validity of the invoices, but neither did he make specific objections to line items in the invoices or plainly state that he believed BF was

not entitled to any further payment.  Indeed, it appears that Ray was deliberately opaque about his views and intentions regarding the invoices, saying to Balestriere, "I'm telling you nothing about invoices.  I don't want to talk to you about invoices."  (Pl. 56.1 ¶ 71).  As Balestriere noted in an email to Ray memorializing a telephone conversation on January 22, 2016:

> I multiple times asked if there was a problem with the invoice and you told me you couldn't say.  When I asked if you would pay the invoice you again said that you wouldn't say.  You asked if I wanted to discuss the filings due in February and I said that we certainly could, but I wanted to know if there would be any problem with receiving payment on the invoice.  You then hung up on me.

(BF Counter 56.1 ¶ 71; Pl. Ex. 71, BF-0012658).  Raimond later encouraged Ray to continue obfuscating, having communicated to Ray the tenor of his conversation with Balestriere about the outstanding invoices: "I informed him that I would speak to you about [the invoices], and advise him of our position. I have not yet done so, mostly because he has not followed up, and I see no benefit to us affirmatively telling him what we plan to do about this bill."  (Pl. Ex. 77, GW-3054).

Given that Ray apparently made a tactical decision to not respond to BF's questions about the invoices, his argument now that he "expressly disputed" his outstanding balance beggars belief.  (*See* Pl. Br. 5).  At the same time, there is evidence in the record suggesting that Ray's actions amounted to an implicit rejection of the validity of BF's invoices and that BF should have understood the situation as such.  Because "the evidence is such that a reasonable jury could return a verdict" for either party, *Anderson*, 477 U.S. at

31

248, the Court denies both parties' motions for summary judgment on BF's account stated claim.

**F.    The Court Grants Summary Judgment to Ray as to Balestriere Fariello's Breach of Contract Counterclaim**

Finally, Ray seeks dismissal of BF's breach of contract counterclaim, wherein BF alleges that Ray "substantially and materially breached the Engagement Agreements [with BF] when he did not pay the Firm as agreed upon in the Engagement Agreements." (Counterclaim ¶ 147). BF does not seek summary judgment in its favor on this claim and does not respond to Ray's arguments for dismissal in its opposition brief.

"If the party opposing summary judgment does not respond to the motion, the court may 'grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it.'" *A.B.* v. *Staropoli*, 929 F. Supp. 2d 266, 274 (S.D.N.Y. 2013) (quoting Fed. R. Civ. P. 56(e)(3)). However, the Court

> may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial. If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied *even if no opposing evidentiary matter is presented.*

*D.H. Blair & Co.* v. *Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (quoting *Vt. Teddy Bear*, 373 F.3d at 244) (emphasis in original).

The Court agrees with Ray that BF's counterclaim for breach of contract fails as a matter of law because, under New York law, BF's exclusive recourse

for seeking unpaid fees following termination is an action in quantum meruit. *See John Harris P.C.* v. *Tobin*, 807 F. App'x 20, 24 (2d Cir. 2020) (summary order) (holding that where a law firm withdrew from representation before the completion of the matter for which they were retained, the firm's "only remedy for recovering the hourly fees it claims the defendants owe is an action for quantum meruit"); *Liddle & Robinson, LLP* v. *Garrett*, 720 F. Supp. 2d 417, 425 (S.D.N.Y. 2010) (holding that "once a client cancels a retainer contract, the retainer's 'terms no longer serve to establish the sole standard for the attorney's compensation' but may 'be taken into consideration as a guide for ascertaining quantum meruit.'" (quoting *Matter of Tillman*, 259 N.Y. 133, 135 (1932))); *Fariello* v. *Checkmate Holdings, Inc.*, 918 N.Y.S.2d 408, 409 (1st Dep't 2011) (holding that where a client cancelled a retainer agreement without cause, a discharged law firm's exclusive remedy for obtaining reimbursement for services rendered is quantum meruit and thus the firm's breach of contract claim was properly dismissed).[6]  The Court therefore grants Ray's motion for summary judgment on BF's breach of contract counterclaim.

---

[6]     The Court notes that BF would be entitled to pursue a claim in quantum meruit only if Ray discharged the firm without cause.  In contrast, "[w]hen a client discharges her attorney for cause, 'the attorney has no right to compensation or a retaining lien, notwithstanding a specific retainer agreement.'"  *Holcombe* v. *Matsiborchuk*, 747 F. App'x 875, 877 (2d Cir. 2018) (summary order) (quoting *Campagnola* v. *Mulholland, Minion & Roe*, 76 N.Y.2d 38, 44 (1990)).  Because BF does not raise a quantum meruit claim, the Court need not determine whether Ray's termination of BF was with or without cause.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion is GRANTED in part and DENIED in part, and the BF Parties' motion is GRANTED in part and DENIED in part.  Plaintiff's JL § 487 claim is DISMISSED, as is BF's counterclaim for breach of contract.  Plaintiff's breach of fiduciary claim and conversion claim, and BF's account stated counterclaim, remain.  The Clerk of Court is directed to terminate the motions at docket entries 79, 98, 101, 102, and 103.

The parties are directed to submit a joint letter on or before **September 15, 2021**, regarding next steps, including, as appropriate, the utility of a further referral to Judge Parker or to the Court's mediation program, and/or the parties' availability for trial in the second half of 2022.

SO ORDERED.

Dated:      August 26, 2021
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge